UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Nicholas L.,

    Plaintiff,

    v.                                                                Civil Action No. 2:18-cv-176

Commissioner of Social Security,

    Defendant.

## OPINION AND ORDER
(Docs. 14, 15)

Plaintiff Nicholas L. brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). Pending before the Court are Plaintiff's motion to reverse the Commissioner's decision (Doc. 14), and the Commissioner's motion to affirm the same (Doc. 15). For the reasons stated below, Plaintiff's motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED for further proceedings and a new decision.

## Background

Plaintiff was 33 years old on his alleged disability onset date of November 14, 2012. He has a high school education, and has worked as a chef, a baker, a sous chef, a short order cook, a sandwich maker, a counter attendant, a blocking machine tender, and a disc jockey. He lives with his father and has never married.

Plaintiff is obese, and suffers from gout,[1] degenerative joint disease, inflammatory arthritis, anxiety, and depression. The gout and arthritis especially affect Plaintiff's hands and feet. In an April 2013 Function Report, Plaintiff stated that he "c[ould] not start any new jobs [due to a] fear that [he] will have . . . inflammation attacks that will put [him] out for weeks at a time." (AR 301.) In a September 2016 Function Report, Plaintiff stated that he sometimes has "bad flares with inflammatory arthritis," where he is "for the most part incapacitated" (AR 318), "l[ying] in bed all day for days" (AR 319). Plaintiff further stated that he "sometimes ha[s] no use of [his] hands or cannot walk or stand." (AR 318.) He also related that he has agoraphobia and panic disorder such that he "can and will not go [out in] public and it is very hard for [him] to conver[se] with people." (*Id.*) In a December 2016 Function Report, Plaintiff stated that every day that he has a gout flare, "it prevents [him] from walking[,] standing[,] sitting[,] or even using [his] hands." (AR 337.) He further stated that his social anxiety "makes it hard for [him] to leave [his] house." (*Id.*)

At the September 2017 administrative hearing, Plaintiff testified that he weighed 420 pounds and measured approximately 5 feet, 8 inches tall. (AR 50.) He stated that he began having flares of gouty arthritis in early 2000, and the flares have become progressively more severe over the years, especially starting in 2011. (AR 59.) According to Plaintiff, the flares are unpredictable but generally occur one

---

[1] "Gout is a common and complex form of arthritis that . . . [is] characterized by sudden, severe attacks of pain, swelling, redness[,] and tenderness in the joints, often the joint at the base of the big toe." Mayo Clinic, *Gout*, https://www.mayoclinic.org/diseases-conditions/gout/symptoms-causes/syc-20372897 (last visited 11/26/19).

to two times each month, and last for about one to two weeks at a time, which prevents him from being able to work. (AR 48, 58, 60, 69–70.) Plaintiff explained that when he is having a flare, the swelling prevents him from being able to do many basic activities, including dressing himself, cutting food, and holding a pencil. (AR 70–71.) He testified that he takes anti-inflammatory medication for his flares, which his doctor advises prevents them from being much worse; and he uses ice, elevation, and injections, and takes pain relievers, to help alleviate the pain from flares. (AR 59, 69, 73, 75–77.) Still, Plaintiff stated that he had "very limited" improvement in his flares in the three years prior to the September 2017 hearing. (AR 61.) Regarding his mental health, Plaintiff testified that his anxiety has increased in the past few years, when his flares started worsening. (AR 49, 62–63, 79.)

In September 2016, Plaintiff filed applications for DIB and SSI, alleging that he has been unable to work since November 11, 2012 due to chronic severe gouty arthritis, osteoarthritis, inflammatory arthritis, panic disorder, social anxiety disorder, depression, morbid obesity, obstructive sleep apnea, and hypothyroidism. (AR 307.) His applications were denied initially and upon reconsideration, and he timely requested an administrative hearing. On September 7, 2017, Administrative Law Judge (ALJ) Joshua Menard conducted a hearing on the disability application. (AR 41–91.) Plaintiff appeared and testified, and was represented by a non-attorney representative. A vocational expert (VE) also testified at the hearing. On October 17, 2017, the ALJ issued a decision finding that Plaintiff was not disabled under the Social Security Act from his alleged disability onset date through the date of the decision. (AR 21–34.) Thereafter, the Appeals Council denied Plaintiff's request for

review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1–5.) Having exhausted his administrative remedies, Plaintiff filed the Complaint in this action on November 6, 2018. (Doc. 3.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims. *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listings). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the

4

ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Menard first determined that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date of November 14, 2012. (AR 23.) At step two, the ALJ found that Plaintiff had the following severe impairments: gout, degenerative joint disease, inflammatory arthritis, obesity, anxiety, and depression. (*Id.*) Conversely, the ALJ found that Plaintiff's thyroid gland disorder, hypertension, hypertriglyceridemia, and obstructive sleep apnea were nonsevere, although the sleep apnea "may create functional deficits in combination with other symptoms that are severe." (AR 24.) The ALJ noted that Plaintiff had a prior period of heavy alcohol use but no longer drinks alcohol, and "there is no indication that [Plaintiff's] alcohol use had any effect on his other impairments or his ability to perform basic work functions." (*Id.*)

At step three, the ALJ determined that none of Plaintiff's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 24–26.) Next, the ALJ determined that Plaintiff had the RFC to perform "sedentary work," as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except as follows:

5

> [Plaintiff] is limited to frequent handling and fingering with his right hand; [he] can occasionally knee, crawl, and climb ladders, ropes, and scaffolds; [he] can frequently crouch; [he] is limited to frequent interaction with supervisors and co-workers and he can have no interaction with the general public; [he] is limited to performing simple, routine tasks.

(AR 26.) Given this RFC, the ALJ found that Plaintiff was unable to perform his past relevant work as a sous chef, a baker, a short order cook, a sandwich maker, a counter attendant, and a blocking machine tender. (AR 32.) Nonetheless, based on testimony from the VE, the ALJ determined that Plaintiff was able to perform other work existing in significant numbers in the national economy, including in the representative occupations of order clerk, document preparer, and charge account clerk. (AR 33.) The ALJ concluded that Plaintiff had not been under a disability from his alleged disability onset date of November 14, 2012 through the date of the decision. (AR 33–34.)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

6

In considering the Commissioner's disability decision, the court "review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the Social Security Act is "a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Plaintiff makes three principal arguments in support of his request for reversal of the Commissioner's decision: (1) the ALJ erred in giving little weight to the medical opinions of treating physicians Dr. Swapna Sharma and Dr. Robert Brady; (2) the ALJ's RFC determination is not supported by substantial evidence, in large part because it contains no findings regarding Plaintiff's need for off-task time, additional breaks, and work absences due to gout flares; and (3) the jobs identified by

7

the VE at step five of the sequential analysis do not fit within the ALJ's RFC determination. In response, the Commissioner argues that the ALJ's decision complies with the applicable legal standards and is supported by substantial evidence.

I.  **ALJ's Analysis of Dr. Sharma's and Dr. Brady's Medical Opinions**

Plaintiff first argues that the ALJ erred in his analysis of the medical opinions of treating primary care physician Dr. Sharma and treating psychologist Dr. Brady. (Doc. 14-1 at 12–20; Doc. 18 at 1–2.) The regulations in effect at the time Plaintiff filed his claim provide that the opinions of treating medical sources such as Drs. Sharma and Brady are generally entitled to deference over opinions provided by non-treating medical and non-medical sources including consultative examiners. The so-called "treating physician rule" provides that a treating source's opinions on the nature and severity of a claimant's functional limitations are entitled to "controlling weight" if they are "well[] supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."[2] 20 C.F.R. § 416.927(c)(2); *see Schisler v. Sullivan*, 3 F.3d 563, 567–69 (2d Cir. 1993); SSR 96-2p, 1996 WL 374188 (July 2, 1996) (rescinded effective March 27, 2017) (providing guidance regarding the treating physician rule). The deference given to a treating source's opinions may be reduced, however, in

---

[2] The "treating physician rule" has been eliminated, but remains applicable to claims like this that were filed before March 27, 2017. *See Cortese v. Comm'r of Soc. Sec.*, No. 16-cv-4217 (RJS), 2017 WL 4311133, at *3 n.2 (S.D.N.Y. Sept. 27, 2017); *see also Rescission of Social Security Rulings 96-2P, 96-5P, and 06-3P*, 82 Fed. Reg. 15263-01, 2017 WL 1105348 (Mar. 27, 2017) (noting that, due to changes in the regulations regarding evaluation of medical evidence for claims filed on or after March 27, 2017, SSRs 92-2p, 96-5p, and 06-3p are rescinded).

8

consideration of other factors, including the length and nature of the treating source's relationship with the claimant, the extent to which the medical evidence supports the treating source's opinions, whether the treating source is a specialist, the consistency of the treating source's opinions with the rest of the medical record, and any other factors that tend to contradict the treating source's opinions. *See* 20 C.F.R. § 416.927(c)(2)–(6); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). If the ALJ gives less than controlling weight to a treating source's opinions, he must provide "good reasons" in support of that decision. *Burgess v. Astrue*, 537 F.3d 117, 129–30 (2d Cir. 2008).

### A.     Dr. Sharma's Opinions

On October 13, 2015, Plaintiff began seeing Dr. Sharma as his primary care physician, mainly for treatment of his gout, hypothyroidism, and obesity. (AR 577.) Almost two years later, on August 24, 2017, Dr. Sharma completed a Medical Source Statement (MSS), wherein she opined that Plaintiff had limited ability to walk, stand, or sit for prolonged periods; and limited ability to use his hands during acute illness. (AR 863–64.) More specifically, Dr. Sharma opined that Plaintiff was able to stand and walk for less than two hours in an eight-hour workday (AR 863, 867); and that repeated gout flares in Plaintiff's hands limited his ability to use his hands persistently, such that Plaintiff was able to do handling, fingering, and fine manipulative activities for only 1/3 of the workday, and reaching activities for less than 1/3 of the workday (AR 868). Dr. Sharma further opined that Plaintiff would be off-task for between 10% and 15% of an eight-hour workday (AR 864); Plaintiff would need "more than ordinary rest breaks during a workday or shift" (*id.*); and Plaintiff

9

would experience work absences due to his impairments "[p]erhaps 1–2 [days]/week; 2–3 [days] a month" (AR 869).

The ALJ gave "little weight" to Dr. Sharma's opinions, in large part because "[s]he only recently began treating [Plaintiff]." (AR 30.) As Plaintiff points out, however, and as noted above, Dr. Sharma began treating Plaintiff in October 2015 (AR 577); therefore, Dr. Sharma had been treating Plaintiff for approximately two years when the ALJ wrote in October 2017 that the Doctor had "only recently began" seeing Plaintiff (AR 30), and Dr. Sharma had treated Plaintiff for nearly two years prior to the date she made her opinions in her August 2017 MSS (AR 869). Moreover, Dr. Sharma treated Plaintiff on a regular basis during that period, often in conjunction with treating rheumatologist Dr. Alicia Zbehlik. (*See, e.g.*, AR 577, 588, 602, 684, 695, 756, 813.) Two years of regular treatment is certainly enough time for a physician to establish a treating relationship with a patient under the regulations. *Cf.*, *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (treating sources who see a patient only once or twice do not have a chance to develop an ongoing relationship with the patient and thus are generally not considered treating physicians); *see* 20 C.F.R. § 416.927(c)(2) (an ALJ should generally "give more weight to" the opinion of a doctor who treated a claimant *on an ongoing basis* and thus could provide a "detailed, longitudinal picture of [the claimant's] medical impairment(s)," offering a more "unique perspective to the medical evidence" than provided by reports from "individual examinations, such as consultative examinations or brief hospitalizations") (emphasis added). And in this case, the record clearly demonstrates that Dr. Sharma was aware of the effect that Plaintiff's gout,

10

inflammatory arthritis, obesity, hypertension, hypothyroidism, anxiety, and panic attacks had on Plaintiff's ability to function. Therefore the ALJ's rationale that Dr. Sharma had "only recently began treating" Plaintiff (AR 30) does not constitute a "good reason" for affording little weight to Dr. Sharma's opinions.

Another rationale provided by the ALJ in support of his valuation of Dr. Sharma's opinions is that they are "not supported by the record," including Dr. Zbehlik's treatment notes. (AR 30.) Again, the Court finds that this does not constitute a "good reason" for affording little weight to Dr. Sharma's opinions. While the ALJ's first rationale—that Plaintiff had not treated with Dr. Sharma for a long enough period—was factually inaccurate, this second rationale is not supported by the record. Rather, the record supports Dr. Sharma's opinions.

First, with respect to Dr. Sharma's opinions regarding Plaintiff's limited ability to use his hands for handling, fingering, and fine manipulative activities; most of the treatment notes from Dr. Sharma and Dr. Zbehlik include observations regarding abnormalities in Plaintiff's hands. For example, Dr. Zbehlik noted in April 2015 that, although Plaintiff was doing better and working on weight loss, even when not experiencing a gout flare, he had "puffy" hands and "difficulty making a fist without frank synovitis in the joints." (AR 573.) In July 2015, Dr. Zbehlik reported that Plaintiff had a "[s]udden onset of right hand swelling" the night before, and his hands were "diffusely puffy." (AR 574–75.) In October 2015, Dr. Sharma reported that the pain in Plaintiff's hands was worse than anywhere else in his body, and his "gouty arthritis" was "getting so bad" that it was affecting his ability to work as a chef and "constraining his ability to do things he likes to do as well as contributing to

11

some of his anxiety [symptoms]." (AR 578.)  In May 2016, Dr. Sharma recorded that Plaintiff had experienced a flare in his hands about a month earlier.  (AR 589.)  Dr. Sharma noted that the flares in his hands were causing Plaintiff "considerable anxiety" (*id.*) and were "particularly disabling" (AR 591).  In June 2016, Dr. Zbehlik recorded that Plaintiff had experienced a gout flare in April of that year, which was "[f]airly severe in his hands."  (AR 593.)  In November 2016, Dr. Zbehlik noted that although Plaintiff's hand was improving since a recent flare, his hands were still "puffy" and his right hand was "tender" at two or three particular points.  (AR 694.)  On the same date, Dr. Sharma reported that Plaintiff's "c[r]ystal-proven gout" was "poorly controlled" (AR 695), and that Plaintiff had right hand edema extending to the wrist (AR 697).  The Doctor also noted that Plaintiff had recently visited the emergency room for a gout flare in his right hand.  (AR 696.)

Given this medical evidence, the ALJ's statement that "the record does not support the consistent . . . handling and fingering limitations in both hands posited by Dr. Sharma" (AR 30), is not supported by substantial evidence.  (*See supra*; *see also* AR 487, 502, 590, 596, 603, 685, 730, 789.)  Moreover, Dr. Sharma's opinions regarding Plaintiff's limitations in handling and fingering abilities are generally supported by the opinions of nonexamining agency consultants Dr. Elizabeth White and Dr. Leslie Abramson, who opined in October 2016 and January 2017, respectively, that Plaintiff was limited in his ability to perform handling and fingering activities due to his gouty arthritis.  (AR 138, 171.)

Dr. Sharma's opinion that Plaintiff had limited ability to walk and stand for prolonged periods is also supported by the record.  For example, in January 2017,

12

Dr. Brady recorded that Plaintiff "walked with a noticeable limp." (AR 834.) And in March 2017, Dr. Brady noted that Plaintiff "presented in a wheelchair due to worsened gout in his foot." (AR 795.) In the same month, Dr. Zbehlik indicated that Plaintiff had had a flare in his foot "for about one week," which caused "[s]evere pain on the bottom of his foot." (AR 787.) The Doctor stated that Plaintiff's "entire foot [wa]s swollen" and "[h]e c[ould] hardly walk." (*Id.*) Again in July 2017, Dr. Zbehlik recorded that Plaintiff was having "[s]evere pain on the bottom of his foot," such that "[h]e c[ould] hardly walk." (AR 730.) The Doctor noted that Plaintiff's "l[eft] ankle seems constantly swollen." (*Id.*) In August 2017, Dr. Zbehlik opined in a MSS that Plaintiff's flares are associated with ankle pain and swelling and might limit his ability to ambulate or perform activities of daily living.[3] (AR 862.)

Likewise, nonexamining agency consultants Dr. White and Dr. Abramson limited Plaintiff to standing and walking for only four hours. (AR 137, 170.) Even the ALJ acknowledged Plaintiff's limited ability to stand and walk, determining that Plaintiff was capable of only "sedentary work" (AR 26), which requires that "periods of standing or walking should generally total no more than about [two] hours of an [eight]-hour workday." SSR 83-10, 1983 WL 31251, at *5 (1983). Therefore, two treating medical providers, two nonexamining agency consultants, and the ALJ, all agree with Dr. Sharma's opinion that Plaintiff's ability to stand and walk was limited during the relevant period. There is disagreement about the degree of limitation; but

---

[3] Dr. Zbehlik also noted in her August 2017 MSS that Plaintiff has "severe gout with intermittent flares," accompanied by "acute pain and swelling," which "can affect any joint and result in acute, severe pain lasting days [to] weeks." (AR 857.) The Doctor opined that, "until [Plaintiff's] uric acid has been well controlled . . . for one year[,] he is at risk for flares," causing him to be absent from work. (AR 862.)

13

where, as here, the treating physician's opinion is consistent with and supported by the record, and where the ALJ has failed to give a good reason to disregard it, the regulations direct that it should be given significant weight. *See* 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."); *id.* at (c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.").

Finally, the ALJ erred in failing to address Dr. Sharma's opinions that Plaintiff would be off-task for between 10% and 15% of an eight-hour workday, would need more than ordinary work breaks, and would experience work absences of one to two days a week or two to three days a month. (AR 864, 869.) The ALJ apparently rejected these critical opinions, *without analysis*, as he included no limitations for off-task time, additional breaks, or work absences, in his RFC determination. (*See* AR 26.) The ALJ should have addressed these opinions and explained his rejection of them, particularly considering the VE's testimony that the limitations assessed by Dr. Sharma would preclude Plaintiff from being able to work. (AR 86–90.) Especially in conjunction with the ALJ's errors discussed above, it was error for the ALJ to fail to provide a "good reason" for rejecting the opinions of Dr. Sharma. *See Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982) (where the court is "unable to fathom the ALJ's rationale in relation to evidence in the record, . . . [the court] w[ill] not hesitate to remand the case for further findings or a clearer explanation for the decision").

## B. Dr. Brady's Opinions

The ALJ also erred in his analysis of the opinions of Dr. Brady, Plaintiff's treating psychologist. In August 2016, Plaintiff began seeing Dr. Brady upon referral from Dr. Zbehlik, for treatment of his recurrent panic attacks. (AR 598–99.) About a year later, in August 2017, Dr. Brady completed a MSS and a letter opinion stating that Plaintiff's psychiatric problems are "of a severe and persistent nature," and have "likely . . . contributed to his difficulty maintaining consistent employment." (AR 875.) Dr. Brady explained that Plaintiff's interactions with people, including both strangers and acquaintances, "result in a sense of panic and severe anxiety leading to avoidance and withdrawal." (*Id.*) Therefore, according to Dr. Brady, Plaintiff would have "difficulty responding appropriately" to coworkers, supervisors, and the general public in the course of a normal workday, responding "with intense anxiety/fear and avoidance." (AR 873.)

The ALJ gave "little weight" to Dr. Brady's opinions because Dr. Brady "did not assess any specific functional limitations" and did not provide "an opinion about how [Plaintiff's panic attacks] would affect his work functioning." (AR 31.) These are not "good reasons" for rejecting the opinions of a treating medical source. First, "a failure to provide a 'function-by-function assessment' is not a basis for discounting a medical opinion." *Doyle v. Berryhill*, No. 5:16-CV-24, 2017 WL 2364312, at *6 (D. Vt. May 31, 2017) (citing 20 C.F.R. §§ 404.1527(c), 416.927(c)); *see Bellinger v. Comm'r of Soc. Sec.*, No. 3:17-CV-1692 (MPS), 2018 WL 6716092, at *5 (D. Conn. Dec. 21, 2018) ("[T]he Court is aware of no authority that determines that a treating physician's opinion should be cast aside where it does not include a function-by-function

15

assessment of the claimant's capabilities." (internal quotation marks omitted)); *Drennen v. Astrue*, No. 10-CV-6007MAT, 2012 WL 42496, at *4 (W.D.N.Y. Jan. 9, 2012) ("[Although] [t]he Second Circuit has yet to address the obligation of an ALJ to conduct a function-by-function analysis before expressing the RFC in terms of exertional levels of work[,] . . . at least five circuit courts of appeal have found that an ALJ is not required to discuss each factor in their opinion." (citation omitted)). And second, the ALJ's finding that Dr. Brady did not provide an opinion about how Plaintiff's panic attacks would affect his work functioning is factually inaccurate.

Dr. Brady explained his opinions in detail and supported them with reference to objective testing, including "the Social Phobia Inventory, Brief Fear of Negative Evaluation-II, Liebowitz Social Anxiety Scale, and Panic Disorder Severity Scale." (AR 875.) Moreover, in support of his opinion that Plaintiff would have difficulty functioning in a work setting, Dr. Brady stated that "exposure to social situations provokes a panic response" in Plaintiff, and explained:

> [T]he panic attacks [Plaintiff] experiences are often uncued, and result from a misinterpretation of [normal] events as evidence of impending physical or mental catastrophe. This misinterpretation and resulting anxiety has led him to avoid situations in which panic is likely. The presence of panic attacks in social situations exacerbates both conditions in a reciprocal manner.

(*Id.*) Not only are these opinions of Dr. Brady important in general because they support Plaintiff's claim that his mental impairments, in part, prevent him from being able to work; but they also support Dr. Sharma's opinions regarding Plaintiff's off-task time, additional breaks, and work absences. In addition, Dr. Brady's opinions are supported by the record, as acknowledged by the ALJ himself, who

16

stated in his decision that "recent treatment records show reports of panic attacks and anxiety," and that "[t]reatment record[s] show that [Plaintiff] consistently presented with anxious mood and affect[,] and reported frequent panic attacks." (AR 31; *see, e.g.*, AR 578 (treatment note from Dr. Zbehlik stating Plaintiff "[r]eports anxiety attacks at night and when in cars and in crowded places," where he "starts feeling anxious in confined areas, feels lightheaded, breaks out into [a] sweat, will start to overthink, and have a subjective sense of doom"), 593 (treatment note from Dr. Zbehlik stating Plaintiff was experiencing depression, anxiety, and "[s]evere panic attacks"), AR 700 (treatment note from Dr. Brady indicating Plaintiff "was extremely fatigued" and "reported absence of sleep in the past several days due to anxiety," sleeping only "two hours in the past three days"), 787 (treatment note from Dr. Zbehlik stating Plaintiff was having a hard time handling his mental health issues, including depression, anxiety, and "[s]evere panic attacks").)

At a minimum, before affording little weight to Dr. Brady's opinions merely because they "did not assess any specific functional limitations," and based on the factually inaccurate statement that Dr. Brady failed to opine about "how [Plaintiff's panic attacks] would affect his work functioning" (AR 31), the ALJ should have sought additional information from Dr. Brady. *See Ayer v. Astrue*, Civil Action No. 2:11-CV-83, 2012 WL 381784, at *5 (D. Vt. Feb. 6, 2012) ("The regulations . . . provide that, when the medical reports received are inadequate for the ALJ to determine whether the claimant is disabled, the ALJ will seek additional evidence or clarification from [the claimant's] medical source." (second alteration in original) (internal quotation marks omitted).)

17

## II. Remaining Claims

The ALJ's flawed analysis of the medical opinions of treating primary care physician Dr. Sharma and treating psychologist Dr. Brady requires remand.[4] *See Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ[]s that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Once a new analysis of these opinions is conducted, the Commissioner will be required to redetermine Plaintiff's RFC and make a new step-five assessment regarding whether other jobs exist in significant numbers in the national economy that Plaintiff can perform.[5] Therefore, the Court need not reach Plaintiff's claims

---

[4] Had the ALJ afforded more weight to the opinions of Dr. Sharma and Dr. Brady, it is likely Plaintiff would have been found disabled, because, as noted above, the VE testified at the administrative hearing that the limitations assessed by these medical providers—including but not limited to being off-task for 10–15% of the workday; being absent from work one to two days a week or two to three days a month; and responding to coworkers, supervisors, and the public with intense anxiety and avoidance—would preclude work. (*See* AR 86–90.)

[5] Of note, in *Ellison v. Berryhill*, 263 F. Supp. 3d 135, 143–44 (D.D.C. 2017), another case involving a plaintiff who experienced episodic gout flares similar to Plaintiff's in this case, the court recently found as follows:

> Plaintiff's episodic [gout] flares were essential to the description of Plaintiff's physic[]a[l] condition and a necessary factor for the [VE] to consider in order to render an accurate determination. . . . [W]ithout evidence to the contrary, or substantial reason to exclude the flares from a description of Plaintiff's condition, the ALJ[] failed to accurately summarize Plaintiff's condition. Further, the ALJ's determination, proposedly based on the [VE's] testimony, in fact[] contradicts the [VE's] testimony that an individual who suffered from occasional physical limitations that caused him to be absent from work unexpectedly and for a period of days would be unemployable in the occupations listed by the [VE].

> As a result, the court finds that substantial evidence does not support the ALJ's findings with regard to Plaintiff's ability to perform the jobs identified by the [VE]. Thus, the court will remand the matter to allow the ALJ to pose an accurate description of Plaintiff's physical condition, to include the limitations caused by his gout flares, to a [VE], and thereafter, to make further findings regarding whether jobs exist in the national economy that Plaintiff can perform.

regarding these issues, *see Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand."), except to note that, after reanalyzing the treating physician opinions on remand, the ALJ shall craft a new RFC determination, present new hypotheticals to the VE, and reassess whether there are jobs existing in significant numbers in the national economy that Plaintiff can perform.

## **Conclusion**

For these reasons, the Court GRANTS Plaintiff's motion (Doc. 14), DENIES the Commissioner's motion (Doc. 15), and REMANDS for further proceedings and a new decision in accordance with this ruling.

Dated at Burlington, in the District of Vermont, this 8th day of January 2020.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge